IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| CATALINA SANTIAGO SANTIAGO, | § § § | |
| Petitioner, | § § | |
| v. | § § | CAUSE NO. EP-25-CV-361-KC |
| KRISTI NOEM, et al., | § § | |
| Respondents. | § § § | |

## ORDER

On this day, the Court considered Petitioner Catalina Santiago Santiago's Verified Petition for Writ of Habeas Corpus, ECF No. 1. For the following reasons, the Petition is **GRANTED IN PART**.

## I.    BACKGROUND

This case involves Santiago's challenge to Respondents' decision to detain her in immigration custody despite Santiago's protection from removal under the Deferred Action for Childhood Arrivals ("DACA") program. The following facts are derived from the verified allegations in the Petition, documentary evidence submitted by the parties, and representations made by counsel during the September 23, 2025, Hearing.

### A.    Arrival in the United States & DACA Receipt

Santiago is a citizen of Mexico who has lived in the United States for twenty years, since she was eight years old. Pet. ¶¶ 2, 8. In 2012, Santiago applied for and received protection from deportation under the DACA program. Decl. Luis Cortes Romero ("Romero Decl.") ¶ 3, ECF No. 22; Romero Decl. Ex. 1 ("DACA Approval Notices") 1, ECF No. 22-1. Her DACA grant

has been renewed six times and remains valid through April 29, 2026.  DACA Approval Notices 2–7.

In or around 2015, Santiago pled guilty to disorderly conduct for her participation in a civil disobedience action.  Pet. ¶ 32.  In 2017, Santiago received similar charges associated with civil disobedience, but they did not result in a conviction.  *Id.*  In 2020, Santiago was arrested for alleged drug and paraphernalia possession in Arizona, but no charges were filed against her.  *Id.* Santiago's grant of DACA was renewed multiple times after her 2015 conviction and 2017 charges, and it was renewed at least twice since her 2020 arrest.  Romero Decl. ¶ 3; DACA Approval Notices 3–7.

Because she is protected by DACA, Santiago is considered "lawfully present" and cannot be removed from the United States.  8 C.F.R. § 236.21(c)(1), (3).  To terminate Santiago's DACA protection prior to its expiration date, United States Citizenship and Immigration Services ("USCIS") must give her notice of the intent to terminate and allow her an opportunity to respond.  *Id.* § 236.23(d)(1).  At the hearing, Respondents' counsel conceded that Santiago has valid DACA protection, and that while that protection is valid, she cannot be removed from the United States.  Minute Entry ("Sept. 23 Hr'g") 13:23:40–13:24:26, 13:33:35–13:34:02, ECF No. 23.[1]  Respondents' counsel also conceded that Santiago has not received notice from USCIS of any intent to terminate her DACA.  *Id.* at 13:33:04–13:34:02.

### B.    Advance Parole

In 2021, Santiago was accepted into the California-Mexico Studies Center's Summer 2022 California-Mexico Dreamers Study Abroad Program in Mexico.  Romero Decl. ¶ 4; Romero Decl. Ex. 2 ("CA-Mexico Studies Letter"), ECF No. 22-2.  To participate in the

---

[1] The timestamps correspond to the local time of day in El Paso, Texas, on September 23, 2025, the day of the Hearing.

program, Santiago applied for a single-entry advance parole for educational purposes with USCIS.  *Id.*  On March 4, 2022, Santiago's request for advance parole was approved, and she was authorized for a single departure from the United States on or after May 1, 2022, and a related return on or before July 1, 2022.  Romero Decl. ¶ 5; Romero Decl. Ex. 3 ("Advance Parole Authorization"), ECF No. 22-3.  Pursuant to the terms of her advance parole, Santiago was not guaranteed to be paroled back into the United States, and she was "still subject to immigration inspection at a port-of-entry to determine whether [she was] eligible to come into the United States via the terms of [the Advance Parole Authorization]."  Advance Parole Authorization 1.  On June 12, 2022, Santiago was inspected and paroled into the United States. Romero Decl. ¶ 6; Romero Decl. Ex. 4 ("Form I-94"), ECF No. 22-4.

### C.    Eligibility for Adjustment of Status

On January 8, 2025, Santiago married United States citizen Desiree Miller.  Romero Decl. ¶ 7; Romero Decl. Ex. 5 ("Marriage License"), ECF No. 22-5; *id.* Ex. 6 ("Desiree Miller U.S. Passport Card"), ECF No. 22-6.  Santiago's immigration counsel is currently preparing a Petition for Alien Relative (Form I-130) and an Application to Register Permanent Resident Status or Adjust Status (Form I-485) for Santiago and Miller, to be filed with USCIS.  Romero Decl. ¶ 9.

### D.    2025 Arrest, Detention, and Immigration Proceedings

On August 3, 2025, Santiago was arrested at the El Paso International Airport by United States Customs and Border Protection Officers and transferred to the custody of Immigration and Customs Enforcement ("ICE").  *Id.* ¶ 10.  Santiago was arrested without a warrant.  Sept. 23 Hr'g 13:06:42–13:06:45.  Subsequent to her arrest, Santiago received a Notice to Appear ("NTA") charging her with inadmissibility to the United States under Section 212(a)(6)(A)(i) of

the Immigration and Nationality Act ("INA").  Pet. ¶ 36; Romero Decl. ¶ 10; Romero Decl. Ex.

7 ("NTA"), ECF No. 22-7.  The NTA states that Santiago "entered the United States at or near

EL PASO, TX, on or about May 1, 2005" and she was "not then admitted or paroled after

inspection by an Immigration Officer."  *Id.* at 1.  It also states that she is "an alien present in the

United States who has not been admitted or paroled."  *Id.*  The NTA is dated August 3, 2025.  *Id.*

Respondents' counsel conceded that the charge on the NTA "is not the proper charge" because

Santiago was, in fact, paroled into the United States in 2022.  Sept. 23 Hr'g 13:20:04–13:20:28.

On September 8, Immigration Judge ("IJ") Michael Pleters of the El Paso SPC

Immigration Court issued a decision terminating Santiago's removal proceedings pursuant to 8

C.F.R. § 1003.18(d)(1)(ii)(C).  *See* Advisory to Ct. 1, ECF No. 16; *id.* Ex. 1 ("IJ Termination

Order"), at 1.  The IJ terminated the removal proceedings because Santiago "has been accorded

DACA" and "[h]er grant of DACA has not been terminated."  IJ Termination Order 1.  The

Department of Homeland Security ("DHS") reserved its right to appeal.  *Id.* at 2.  Respondents'

counsel represented that it was her belief that Respondents had filed an appeal, but if not,

Respondents intend to do so.  Sept. 23 Hr'g 13:41:17–13:41:28.  Counsel also represented that

Respondents have not filed a Form I-261 amending the NTA—despite recognizing that it is

deficient—because the case is on appeal.  *Id.* at 13:22:12–13:22:16.

Pursuant to an ICE Memorandum dated June 24, 2025, its "field offices no longer have

the option to discretionarily release aliens."  Romero Decl. ¶ 14; Romero Decl. Ex. 8 ("ICE

Memorandum") 2, ECF No. 22-8.  Counsel for Respondents represented that notwithstanding the

ICE Memorandum, humanitarian parole is "more limited" and that "it might seem impossible,

but it is possible."  Sept. 23 Hr'g 13:42:00, 13:43:20–13:43:32.

Santiago remains detained at the El Paso Service Processing Center.  Pet. ¶ 37; Sept. 23 Hr'g 13:07:48–13:07:51.  She has not received a bond hearing.  Sept. 23 Hr'g 13:07:18– 13:07:22.

### E.    Procedural History

On September 2, Santiago filed her Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241, seeking an order for her release from ICE custody.  Pet. ¶¶ 4–5.  Santiago challenges the legality of her detention on constitutional and statutory grounds.  *Id.* ¶¶ 43–79.

On September 8, Santiago filed a Motion for Temporary Restraining Order, ECF No. 14, requesting entry of a temporary restraining order ("TRO") to prohibit her removal from the country and transfer from the judicial district while this case remains under consideration, which the Court granted on September 9.  Order Granting TRO, ECF No. 15.  On September 23, the Court held a hearing, at which Santiago, her attorneys, and Respondents' counsel were present.  At the conclusion of the hearing, the Court extended the TRO through October 7, 2025.  Sept. 23, 2025, Order, ECF No. 24.

In addition to the Petition and the evidence discussed above, the Court has received Respondents' Response, ECF No. 20, and Santiago's Reply, ECF No. 21.

## II.    DISCUSSION

Santiago seeks a writ of habeas corpus for her immediate release from custody, arguing that her arrest and continued detention violate her rights under the Fourth and Fifth Amendments of the United States Constitution, as well as the Administrative Procedure Act ("APA"), and the *Accardi* doctrine.  Pet. ¶¶ 43–79, 20–21.  Respondents argue, as a threshold matter, that the Court lacks subject matter jurisdiction to adjudicate Santiago's custody and that Santiago's APA and Fourth Amendment claims are not cognizable under habeas.  On the merits, Respondents

argue that Santiago's detention comports with substantive and procedural due process because DACA regulations permit Respondents to commence removal proceedings against her and Section 1225(b) of the INA mandates her detention without bond, absent a grant of humanitarian parole in ICE's discretion, while those proceedings are pending.  Resp. 10–21.

### A.    Subject Matter Jurisdiction

Because it concerns the Court's power to decide the case, "[j]urisdiction is always first." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 466 (5th Cir. 2024) (quoting *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021)); *see also United States v. Willis*, 76 F.4th 467, 479 (5th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citation omitted).  And several sections of the INA curtail the jurisdiction of federal district courts in immigration cases. *See Jennings v. Rodriguez*, 583 U.S. 281, 292–96 (2018).

Respondents appeal to three such jurisdiction-stripping provisions here: 8 U.S.C. § 1252(g), § 1252(b)(9), and § 1252(a)(5).  Resp. 11–16.  All three eliminate or severely limit the jurisdiction of federal district courts to consider habeas petitions filed by people in immigration detention.  But each provision is triggered by challenges to different agency decisions.  Section 1252(g) applies to "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien . . . ."  Section 1252(a)(5) concerns only challenges to "an order of removal."  Finally, § 1252(b)(9) relates to "questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States . . . ."

1.    **Section 1252(g)**

Respondents argue that the Court lacks jurisdiction under § 1252(g).  Resp. 11–13.  On

its face, § 1252(g) prohibits federal district courts from considering "any cause or claim by or on

behalf of any alien arising from the decision or action by the Attorney General to commence

proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

But the Supreme Court has "not interpret[ed] this language to sweep in any claim that can

technically be said to 'arise from' the three listed actions of the Attorney General.  Instead, [the

Court has] read the language to refer to just those three specific actions themselves." *Jennings*,

583 U.S. at 294 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–83

(1999)).  Thus, § 1252(g) applies only "to protect from judicial intervention the Attorney

General's long-established discretion to decide whether and when to prosecute or adjudicate

removal proceedings or to execute removal orders."  *Duarte v. Mayorkas*, 27 F.4th 1044, 1055

(5th Cir. 2022) (quoting *Alvidres-Reyes v. Reno*, 180 F.3d 199, 201 (5th Cir. 1999)).  The statute

"does not bar courts from reviewing an alien detention order, because such an order, 'while

intimately related to efforts to deport, is not itself a decision to "execute removal orders" and

thus does not implicate section 1252(g).'"  *Cardoso v. Reno*, 216 F.3d 512, 516–17 (5th Cir.

2000) (citation omitted); *accord Kong v. United States*, 62 F.4th 608, 617–18 (1st Cir. 2023)

(collecting cases).  Courts have thus found that § 1252(g) does not prevent them from

considering detention-related challenges brought by deferred action recipients, including DACA

recipients.  *See, e.g.*, *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 866–67 (6th Cir. 2022);

*Sepulveda Ayala v. Bondi*, No. 25-cv-1063, 2025 WL 2084400, at *3–5 (W.D. Wash. July 24,

2025); *Primero v. Mattivelo*, No. 25-cv-11442, 2025 WL 1899115, at *3 (D. Mass. July 9, 2025).

Here, Santiago is not challenging Respondents' decision to execute a removal order. There is no removal order to execute and Respondents concede that they could not execute any hypothetical removal order until Santiago's DACA expires or is terminated.  Sept. 23 Hr'g 13:33:35–13:34:02.  Nor is Santiago challenging Respondents' decision to commence or adjudicate her removal proceedings.  Santiago successfully moved to terminate her removal proceedings pursuant to 8 C.F.R. § 1003.18(d)(1)(ii)(C) and Respondents have reserved their right to appeal.  *See* Advisory to Ct. 1; IJ Termination Order 2.  If it has been filed, that appeal remains pending with the BIA.  But in this Court, Santiago does not challenge the continued adjudication of her removal proceedings.  Instead, she challenges her ongoing detention.  Such claims are not barred by § 1252(g).  *See, e.g.*, *Lopez Santos v. Noem*, No. 25-cv-1193, 2025 WL 2642278, at *2–3 (W.D. La. Sept. 11, 2025).

### 2.    Sections 1252(b)(9) and 1252(a)(5)

Respondents also argue that the Court lacks jurisdiction under § 1252(b)(9) and § 1252(a)(5) because these sections channel issues arising from any action or proceeding brought to remove an alien, including detention, through the circuit court.  Resp. 13–16.

Sections 1252(b)(9) and (a)(5) are "'zipper clause[s]' that aim to funnel judicial review of final deportation orders and questions of law or fact arising from deportation proceedings into a single mechanism."  *Duarte*, 27 F.4th at 1056 (quoting *Duron v. Johnson*, 898 F.3d 644, 647 (5th Cir. 2018)).  The plurality opinion in *Jennings*, however, declined to apply an expansive interpretation of "arising from" and held that § 1252(b)(9) did not present a bar to reviewing the immigration habeas petitioners' challenge to their mandatory detention.  *Jennings*, 583 U.S. at 293.  An expansive interpretation would make "claims of prolonged detention effectively unreviewable."  *Id.* at 293.  In rejecting Justice Thomas' concurring opinion that § 1252(b)(9)

does present a bar because "detention *is* an 'action taken . . . to remove' an alien," *see id.* at 318 (Thomas, J, concurring), the plurality explained that, "[t]he question is not whether *detention* is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action," *id.* at 295 n.3. The plurality opinion held that the legal questions of whether mandatory detention without a bond hearing was proper were "too remote from [removal actions] to fall within the scope of § 1252(b)(9)." *Id.* In 2019, a plurality of the Supreme Court again found that § 1252(b)(9) did not strip it of jurisdiction to hear a group of immigrants' challenges to their mandatory detention under 8 U.S.C. § 1226(c). *See Nielsen v. Preap*, 586 U.S. 392, 402 (2019).

Respondents argue that because Santiago challenges "the decision to detain [her] in the first place," *Jennings* prohibits jurisdiction here. Resp. 16 (citing *Jennings*, 583 U.S. at 294–95). However, in both *Jennings* and *Nielsen*, the plurality held that § 1252(b)(9) did not present a jurisdictional bar to challenges to mandatory detention without a bond hearing. Respondents' argument thus appears to be that because Santiago challenges her detention as unlawful and seeks immediate release, and, only in the alternative, seeks a bond hearing, § 1252(b)(9) precludes this Court's review of her claims. This interpretation of *Jennings* is unpersuasive as it makes a distinction without a difference—like the habeas petitioners in *Jennings* and *Nielsen*, Santiago challenges her mandatory detention, not her removal, as unlawful. And like them, Santiago's habeas claim can proceed in federal district court.

Respondents' argument seizes on dicta in the *Jennings* plurality opinion. There, in the course of rejecting Justice Thomas's jurisdiction-stripping conclusion, the Court noted that the detainees in that case asked only for a bond hearing following prolonged detention, but did not challenge the very fact of their detention in the first place. *Jennings*, 583 U.S. at 294–95. But more recently, a majority of the Supreme Court characterized *Jennings* as holding that

§ 1252(b)(9) "'does not present a jurisdictional bar' where those bringing suit 'are not asking for review of an order of removal,' 'the decision ... to seek removal,' or 'the process by which ... removability will be determined.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020). The *Regents* opinion omitted *Jennings*' reference to the possibility that detainees' challenges to "the decision to detain them in the first place" may also be barred by § 1252(b)(9). This reinforces the conclusion that the *Jennings* plurality only discussed challenges to "the decision to detain . . . in the first place" as a rhetorical tool in its disagreement with the concurrence, and not in order to mark a distinction between those seeking immediate release and those seeking a bond hearing.

Respondents' argument is also foreclosed by post-*Jennings* Fifth Circuit decisions. In 2022, that court stated that "where review of any agency determination involves neither a determination as to the validity of [an immigrant's] deportation orders or the review of any question of law or fact arising from their deportation proceedings, § 1252(a)(5) and (b)(9) should not operate as a bar to the district court's review." *Duarte*, 27 F.4th at 1056. Most recently, in addressing Texas' challenge to the entire DACA program, the Fifth Circuit noted that § 1225(b)(9) "does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined," tracking the language in *Regents*. *Texas v. United States*, 126 F.4th 392, 417 (5th Cir. 2025).

And many other courts have specifically found that § 1252(b)(9) does not present a jurisdictional bar to habeas challenges to immigration detention. *See, e.g.*, *Ozturk v. Hyde*, 136 F.4th 382, 399 (2d Cir. 2025); *Escalante v. Noem*, No. 25-cv-182, 2025 WL 2206113, at *2–3 (E.D. Tex. Aug. 2, 2025); *Ayobi v. Castro*, No. 5:19-cv-1311-OLG, 2020 WL 13411861, at *3

(W.D. Tex. Feb. 25, 2020); ; *cf. Kong*, 62 F.4th at 614–16 (finding plaintiff's Federal Tort Claims Act lawsuit challenging unlawful detention not barred by § 1252(b)(9) for the same reasons a habeas petition is not barred).  This includes DACA recipients' challenges to their unlawful detention as a result of improper termination of their DACA.  *See, e.g.*, *Medina v. U.S. Dep't Homeland Security*, No. 17-cv-218, 2017 WL 2954719, at *15 (W.D. Wash. Mar. 14, 2017).

On September 8, 2025, the removal proceedings against Santiago were terminated on the basis of her current DACA protection.  *See* IJ Termination Order 1.  Although Respondents have appealed—or at least reserved their right to appeal—and thus, the removal proceedings remain pending, there is no final order of removal against Santiago. Sept. 23 Hr'g 13:31:42–13:31:47. And even if this Court were to order Santiago's release from custody, it would remain for the BIA to decide Respondents' appeal and for the immigration courts to proceed with any reinstated removal proceedings thereafter.  In other words, nothing prevents any removal proceedings from continuing while Santiago is at liberty, instead of in custody.  Because Santiago's "arrest and detention claims are independent of any future removal order," neither § 1252(a)(5) nor (b)(9) pose a jurisdictional bar.  *See Medina*, 2017 WL 2954719, at *15.

In sum, none of Respondents' jurisdictional arguments are availing.

## B.    Administrative Procedure Act

Santiago brings a claim under Section 706 of the APA, arguing that Respondents' detention of her "despite her valid grant of DACA, which prohibits her removal from the United States," "her long-standing ties to the United States," "and no changed circumstances suggesting she presents any risk of flight or threat of public safety[,] is arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence."  Pet. 14–15.  Respondents argue that

Santiago's APA claim is not cognizable under habeas corpus and thus should be dismissed. Resp. 11.

Assuming without finding that APA claims are cognizable under habeas, when review of an agency action is sought "under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (quoting 5 U.S.C. § 704) ("Agency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review") (emphasis added). "Agency action must meet two conditions to be final: (1) 'the action must mark the 'consummation' of the agency's decisionmaking process' and (2) 'the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Patterson v. Def. POW/MIA Acct. Agency*, 343 F. Supp. 3d 637, 651 (W.D. Tex. 2018) (citing *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999)). Where there is no final agency action, federal courts lack subject matter jurisdiction. *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011).

In *Qureshi*, the Fifth Circuit affirmed dismissal of an APA challenge to USCIS's termination of asylum, finding that termination of asylum is not a final agency action because it is "only an intermediate step in a multi-stage administrative process, succeeded (or accompanied) by removal proceedings." 663 F.3d at 781. Although the Court noted that "the IJ and BIA lack jurisdiction to review asylum terminations, they both retain the power to halt removal proceedings altogether, either by an alien's successful contest to removability . . . or by a successful new asylum application . . ." *Id.*

Here, Santiago's removal proceedings have already been terminated and BIA retains the power to affirm this termination and order her release, demonstrating that "further administrative

relief is available" and thus her detention is not the consummation of the agency's decision-making process. *See id.* This decision accords with at least one district court in the Fifth Circuit, which has extended *Qureshi's* reasoning to hold that "[d]etention pending a decision on removal is not a final agency action." *Bhatia v. United States*, No. 16-cv-11, 2016 WL 6127799, at *2 (S.D. Miss. Sept. 19, 2016), *report and recommendation adopted*, 2016 WL 6126666 (Oct. 20, 2016) (citing *Qureshi*, 663 F.3d at 781). It also aligns with another district court decision which recently held that a DACA recipient and habeas petitioner failed to show a likelihood of success on the merits of his APA claim because detention does not constitute a final agency action. *See Gamez Lira v. Noem*, No. 25-cv-855, 2025 WL 2581710, at *4 (D.N.M. Sept. 5, 2025).

Accordingly, the Court does not have jurisdiction to review Santiago's APA claim.

### C.    Procedural Due Process

Turning to Santiago's due process claims,[2] Respondents argue that Santiago's detention comports with procedural due process because she has been given "the constitutional minima of due process." Resp. 19. Respondents argue that they are permitted to commence removal proceeding against her under governing regulations, which provide that "[a] grant of deferred action under [DACA] does not preclude DHS from commencing removal proceedings at any time." *Id.* at 20; 8 C.F.R. § 236.21(c)(1); Sept. 23 Hr'g 13:22:49–13:23:16. And while her removal proceedings are pending, Respondents argue that she is subject to mandatory detention under 8 U.S.C. § 1225(b) because she is an "arriving alien."[3] Resp. 6, 9–10, 16–17. They argue

---

[2] Because the Court lacks jurisdiction to review Santiago's APA claim, the Court proceeds to her constitutional claims. However, because the Court grants Santiago's Petition on procedural due process grounds, the Court need not reach Santiago's substantive due process or Fourth Amendment claims. Nor does the Court consider Respondents' contention that Santiago's APA and Fourth Amendment claims are not cognizable under habeas and must be severed. *See* Resp. 11.

[3] That subsection is entitled, "Inspection of applicants for admission." 8 U.S.C. § 1225(b). It provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer

that the INA requires them to detain Santiago without a bond hearing, even though she is a DACA recipient and is protected from removal until April 2026. *Id.* at 16–17; Sept. 23 H'rg 13:33:35–13:34:22. At the Hearing, Respondents clarified that even if Santiago was not an "arriving alien" pursuant to the termination of her advance parole, "under this administration in this current interpretation . . . [Santiago would be subject to] mandatory detention anyway under either . . . 1225(b)(1) or 1225(b)(2) whether she was entry without inspection or whether she was an arriving alien." Sept. 23 Hr'g 13:34:34–13:35:02.

In recent weeks, courts across the country have held that this new, expansive interpretation of mandatory detention under the INA is either incorrect or likely incorrect.[4] *See Lopez-Campos v. Raycraft*, --- F. Supp. 3d ----, 2025 WL 2496379, at *8 n.5 (E.D. Mich. Aug. 29, 2025) (collecting twelve such decisions); *see, e.g.*, *Jimenez v. FCI Berlin, Warden*, --- F. Supp. 3d ----, 2025 WL 2639390, at *10 & n.9 (D.N.H. Sept. 8, 2025). That includes courts in the Fifth Circuit. *See Lopez Santos*, 2025 WL 2642278, at *5; *Kostak v. Trump*, No. 25-cv-1093, 2025 WL 2472136, at *3 (W.D. La. Aug. 27, 2025). Regardless, as discussed above, the Court dismisses Santiago's APA claim challenging Respondents' statutory interpretation and thus does not consider whether the agency's new mandatory detention policies reflect a proper reading of the INA. The issue the Court reaches instead is whether those policies have been applied to Santiago in an unconstitutional manner. *See, e.g.*, *Perez v. Kramer*, No. 25-cv-3179, 2025 WL 2624387, at *3 (D. Neb. Sept. 11, 2025) (declining to consider "the validity of the government's argument that [the p]etitioner should be mandatorily detained under § 1225" and considering, instead, the due process question).

---

determines that an alien seeking admission is not clearly beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of [the INA]." *Id.* § 1225(b)(2)(A).

[4] Many of these decisions have been made in the context of requests for preliminary injunctive relief.

1.    **The Effect of *Thuraissigiam***

In that vein, Respondents argued at the Hearing that Santiago is entitled to no more due

process than the statute gives her.  Sept. 23 Hr'g 13:56:42–13:56:51 (citing *Dep't of Homeland

Sec. v. Thuraissigiam*, 591 U.S. 103 (2020)) ("[A]rriving aliens are entitled only to due process

protections that the statute afford[s] them.").  In *Thuraissigiam*, the Supreme Court rejected a

noncitizen's due process claim, explaining that people detained at or near the border are treated

as "applicants for admission" and are afforded "only those rights regarding admission that

Congress has provided by statute."  591 U.S. at 140.  Although *Thuraissigiam* certainly limited

the scope of due process claims available to "applicants for admission," the decision's sweeping

statements must be read in context.  *See id.*

The noncitizen in *Thuraissigiam* was detained under § 1225 immediately after entering

the United States, and an asylum officer determined that he did not sufficiently establish a

credible fear, so he was placed in expedited removal proceedings.  *Id.* at 140.  He attempted to

challenge this negative credible fear determination through a writ of habeas corpus, in which he

requested a "new opportunity to apply for asylum and other applicable forms of relief."  *Id.* at

114–15.

a.    **Deportability vs. Detention**

This description reveals two key points of distinction between *Thuraissigiam* and

Santiago's case.  First, Thuraissigiam challenged the denial of his asylum claim, whereas

Santiago challenges her detention in immigration custody.  *See id.*  The Court centered its

analysis on the scope of habeas relief, which permits challenges to unlawful detention, but

cannot provide another "opportunity to remain lawfully in the United States."  *Id.* at 117–20.  For

purposes of his application for admission, Thuraissigiam had already received his due process

through the credible fear interview and was subject to immediate removal and deportation thereafter. It was in this context that the Court determined that "an alien in [his] position has only those rights *regarding admission* that Congress has provided by statute." *Id.* at 140 (emphasis added). The Court did not address whether noncitizens mandatorily detained under § 1225(b) have a constitutional due process right to challenge the fact or length of their detention, as Santiago does here.

This reading is bolstered by another contemporaneous Supreme Court decision. In *Jennings*, the Court held the mandatory detention statutes, § 1225(b) and § 1226(a), did not impose a six-month detention limitation, nor did the statutes require periodic bond hearings. 583 U.S. at 297–301, 312. That is, at least as a matter of statutory construction. *See id.* But the Court expressly left open the constitutional due process question and remanded the case with instructions that the lower courts consider the constitutional issue in the first instance. *Id.* at 312 ("Consistent with our role as 'a court of review, not of first view'" "we do not reach" "respondents' constitutional arguments on their merits.") (citations omitted). Four years later, attorneys for the Government conceded before the Supreme Court "that as-applied constitutional challenges remain available to address 'exceptional' cases" in the context of immigration detention. *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 583 (2022). And the Court again declined to consider the constitutional questions, electing to "leave them for the lower courts to consider in the first instance." *Id.* (citing *Jennings*, 583 U.S. at 312).

Just this year, *Thuraissigiam* notwithstanding, the Supreme Court reaffirmed in broad terms that "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Thus, the Supreme Court has not addressed

the viability of constitutional due process challenges to mandatory immigration detention—even for those who, like Santiago, are considered arriving aliens, and thus applicants for admission.

The importance of the deportability-detention distinction is underscored by a series of post-*Thuraissigiam* circuit-court decisions. At least five circuit courts have all since considered due process challenges to unreasonably prolonged mandatory detention under § 1226, and, tellingly, none of them referenced *Thuraissigiam* in their majority opinions. *See Banyee v. Garland*, 115 F.4th 928, 933 (8th Cir. 2024); *Black v. Decker*, 103 F.4th 133, 138 (2d Cir. 2024); *Wekesa v. U.S. Att'y*, No. 22-cv-10260, 2022 WL 17175818, at *1 (5th Cir. Nov. 22, 2022); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 39 (1st Cir. 2021);[5] *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 208 (3d Cir. 2020). Instead, they all referenced *Jennings*. *Banyee*, 115 F.4th at 930; *Black*, 103 F.4th at 140–46; *Wekesa*, 2022 WL 17175818, at *1; *Hernandez-Lara*, 10 F.4th at 27; *German Santos*, 965 F.3d at 208–10. That is, they all cited the detention case—not the deportability case—when considering the viability of a due process challenge to immigration detention. None support Respondents' proposition that *Thuraissigiam* applies in the detention context.

While the Eighth Circuit nonetheless held that "[d]ue process imposes no time limit on detention pending deportation," *Banyee*, 115 F.4th at 930, the First, Second and Third Circuits applied thoughtful balancing tests for determining when mandatory detention may become unconstitutionally prolonged. *Black*, 103 F.4th at 149–51; *Hernandez-Lara*, 10 F.4th at 27; *German Santos*, 965 F.3d at 210–11. For its part, the Fifth Circuit, in a divided panel opinion, found that "the district court did not err by denying Wekesa's § 2241 petition" because he failed to "meet the statutory requirements for release under Section 1226(c)(2)." 2022 WL 17175818,

---

[5] Only in *Hernandez-Lara* was *Thuraissigiam* mentioned once by the dissenting judge. 10 F.4th at 57 (Lynch, J., dissenting).

at *1.  Although the court fleetingly noted that Wekesa raised a due process challenge, it did not

address that argument or the facts underlying the case in its brief order, and neither did the

district court.  *Id.* at *2 n.1.  Judge Dennis dissented and noted that the Supreme Court's decision

in *Jennings* expressly left open the question of whether the Constitution entitles immigration

detainees to some additional process, such as a bond hearing, in certain circumstances.  *Id.*  In his

view, "prolonged detention without a bond hearing implicates due process protections and must

be analyzed further" because the Fifth Amendment protects "citizens and non-citizens alike."  *Id.*

at *2 (citations omitted).

Because *Wekesa* is an unpublished opinion, it has no binding precedential value, and the

Court considers it only to the extent it is persuasive on the force of its own reasoning.  5th Cir.

L.R. 47.5; *see, e.g.*, *Pena v. Atascosa Cnty.*, No. 5:24-cv-199-JKP, 2025 WL 310144, at *9 n. 5

(W.D. Tex. Jan. 27, 2025) (declining to follow a Fifth Circuit decision because "an unpublished

opinion . . . has no precedential value.").  The Court does not find the *Wekesa* opinion persuasive

because it did not discuss the due process issue at all or provide sufficient facts from which the

Court could discern the reasons for which it rejected the due process claim.  On the other hand,

the Court finds Judge Dennis' dissent persuasive, especially in light of other persuasive authority

from out of circuit.  *See German Santos*, 965 F.3d at 210–11.

More fundamentally, *Wekesa* is inapposite because it involved a due process challenge to

prolonged, mandatory detention under § 1226.  Here, however, Santiago challenges the decision

to subject her to mandatory detention under § 1225(b) at all, without any process or

individualized reasons, and without terminating her DACA.  These significant differences

highlight the difficulty in applying *Wekesa*, with its scant analysis, here.  And even *Wekesa* did

not purport to read *Thuraissigiam* to entirely foreclose due process challenges in the mandatory

detention context, as Respondents would have the Court do.

Other courts have rejected such arguments for similar reasons. *See, e.g.*, *Espinoza v.

Kaiser*, No. 25-cv-1101, 2025 WL 2581185, at *7 n.9 (E.D. Cal. Sept. 5, 2025) (citation

omitted).  For example, in one case, ICE "ask[ed] the Court to extract from *Thuraissigiam* a

broad rule that any inadmissible noncitizen possesses only those due process rights afforded to

them by statute, regardless of the nature of their status or the relief they seek." *See Padilla v.

U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1171 (W.D. Wash. 2023).  But

*Thuraissigiam* "constrain[ed] itself to determining only whether those challenging the admission

process have due process rights." *Id.* at 1172.  Therefore, it did "not foreclose [the p]laintiff's

due process claims" challenging the procedures under which they were subjected to immigration

detention. *Id.* at 1172.  So too here.

### b.    Significant Presence in the Country

At the Hearing, Respondents argued that the *Thuraissigiam* Court addressed not only

deportability but also detention when it noted that Thuraissigiam "d[id] not dispute that

confinement during the pendency of expedited asylum review, and even during the additional

proceedings he seeks, is lawful.  Nor could he." Sept. 23 Hr'g 13:56:42–13:56:51;

*Thuraissigiam*, 591 U.S. at 118.  Even so, Respondents' counsel appeared to acknowledge that

*Thuraissigiam* does leave open at least some as-applied due process challenges to immigration

detention, but argued that any as-applied challenge by Santiago is foreclosed by these two lines

of dicta.  Sept. 23 Hr'g 13:30:31–13:30:40, 13:57:47–13:57:53.

This leads to a second key point of distinction between Thuraissigiam and Santiago's

circumstances.  Thuraissigiam was stopped by Border Patrol "within twenty-five yards of the

border," immediately detained, and never released. *Thuraissigiam*, 591 U.S. at 114. In contrast, Santiago first entered the country in 2005 and has lived in the United States for the past twenty years. Sept. 23 Hr'g 13:04:41–13:04:46. She was approved for DACA in 2012 and her DACA has been renewed six times since, with her most recent grant expiring in April 2026. Romero Decl. ¶ 3. In 2022, Santiago was approved for advance parole, and on June 12, 2022, she was inspected and paroled into the United States. *Id.* ¶ 6. Santiago was arrested and detained by immigration authorities for the first time on August 3, 2025. *Id.* ¶ 10. While Thuraissigiam saw little of this country beyond his jail cell at the border and never received any immigration benefit from the Government, Santiago has built a life here and is protected from removal until at least April 2026.

At the heart of *Thuraissigiam* was the notion that "an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause" than those set by Congress. 591 U.S. at 107 (citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)). "Th[is] distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*, 533 U.S. 678, 693 (2001). And the distinction is one of place—not status: "[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality." *Martinez v. Hyde*, --- F. Supp. 3d ----, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025) (quoting *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958)). "'In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely "on the threshold of initial entry."'" *Id.* (quoting *Leng May Ma*, 357 U.S. at 187). For someone like Santiago, who was detained after living, studying, working, and marrying in this country over the course of two

decades, "it cannot be denied that she was 'already in the country.'"  *See id.* (quoting *Jennings*, 583 U.S. at 289).

In sum, *Thuraissigiam* does not prohibit Santiago from pursuing her due process claim, for two reasons.  First, because she challenges her detention, not her deportability—Santiago has already successfully moved an IJ to terminate her removal proceedings, which remain pending pursuant to Respondents' appeal.  And even if Respondents were to obtain a final order of removal, they would not be able to execute it while Santiago remains protected by DACA.  The only issue in dispute in this case is Santiago's detention.  And second, because she was detained after twenty years of presence in the United States, rather than on the threshold of initial entry, her circumstances are nothing like Thuraissigiam's, and her as-applied due process challenge cannot thus be rejected out of hand.

## 2.    The *Mathews* Test

Turning, then, to the merits of Santiago's procedural due process challenge, "[t]o determine whether a civil detention violates a detainee's due process rights, courts apply the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976)."  *Martinez v. Noem*, No. 5:25-cv-1007-JKP, 2025 WL 2598379, at *2 (W.D. Tex. Sept. 8, 2025).  Those factors are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.  "The essence of procedural due process is that a person risking a serious loss be given notice and an opportunity to be heard

in a meaningful manner and at a meaningful time." *M.S.L. v. Bostock*, No. 25-cv-1204, 2025 WL 2430267, at *8 (D. Or. Aug. 21, 2025) (citing *Mathews*, 424 U.S. at 348).

### a.     Private Interest

As to the first element, "'[t]he interest in being free from physical detention' is 'the most elemental of liberty interests.'" *Martinez v. Noem*, 2025 WL 2598379, at *2 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). Respondents do not engage with the *Mathews* factors, but their position appears to be that, because she is subject to mandatory detention under the new interpretation of § 1225(b), Santiago has no cognizable interest in her liberty. Resp. 17–19. For purposes of this analysis, the Court can assume without finding that Respondents' interpretation of the law is permissible as a matter of statutory construction. But, as other courts have noted in considering this issue, "Respondents fail to contend with the liberty interests created by the fact that the Petitioner[] in this case" was granted DACA and has never been detained since she was first granted DACA in 2012, "*prior to the manifestation of this interpretation*."[6] *Espinoza*, 2025 WL 2581185, at *10; *accord Gamez Lira*, 2025 WL 2581710, at *3 (finding petitioner likely possessed a protectable liberty interest after living in the United States for ten years with DACA "under the understanding that he was unlikely to be subject to enforcement proceedings").

This position is supported by decisions holding that a DACA recipient must be provided with due process before their DACA is terminated. *See Inland Empire - Immigrant Youth Collective v. Nielsen*, No. 17-cv-2048, 2018 WL 4998230, at *19 (C.D. Cal. Apr. 19, 2018); *Medina v. U.S. Dep't of Homeland Sec.*, No. 17-cv-218, 2017 WL 5176720, at *9 (W.D. Wash. Nov. 8, 2017). Although DACA is a discretionary benefit, not an entitlement, once DACA is

---

[6] Courts have long considered as-applied due process challenges to other mandatory detention provisions of the INA and found noncitizens to possess a cognizable interest in their freedom from custody. *See, e.g.*, *Gashaj v. Garcia*, 234 F. Supp. 2d 661, 666 (W.D. Tex. 2002) (finding permanent residents subject to mandatory detention due to a criminal conviction "have a fundamental right to a determination of whether their liberty interests should be impinged during the deportation process.").

conferred, a recipient has a protected property interest in retaining that benefit. *See Inland Empire*, 2018 WL 4998230, at \*19; *see also Texas*, 126 F.4th at 422 (citations omitted) (staying recission of DACA as to existing applicants because "'DACA has had profound significance to recipients and many others in the [now-twelve] years since its adoption'" and has thus created "immense reliance interests."). A core benefit of DACA is that it allows recipients to live, study, and work in the United States without fear of arrest or deportation. It would be incongruous to find that DACA recipients acquire a constitutionally protected interest in their DACA benefit, but not one of its essential facets: their liberty.

This position also finds support in the longstanding principle in the criminal context that due process requires a pre-deprivation hearing before the revocation of parole. *See Espinoza*, 2025 WL 2581185, at \*9 (citing *Young v. Harper*, 520 U.S. 143, 147–49 (1997)). "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)). Parolees thus have a protected liberty interest in their "continued liberty." *Id.* (citation omitted). A number of district courts have extended this reasoning to the immigration context and held that once released from immigration custody, noncitizens acquire "a protectable liberty interest in remaining out of custody on bond." *Diaz v. Kaiser*, No. 25-cv-5071, 2025 WL 1676854, at \*2 (N.D. Cal. June 14, 2025) (collecting cases); *accord M.S.L.*, 2025 WL 2430267, at \*8 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond." (quoting *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019)); *Rosado v. Figueroa*, No. 25-cv-2157, 2025 WL 2337099, at \*12 (D. Ariz. Aug. 11, 2025) (same).

Because she spent roughly twenty years at liberty in the United States—and thirteen of those years with the Government's permission under DACA—Santiago possesses a cognizable interest in her continued freedom from detention.

### b.    Risk of Erroneous Deprivation

Under the second *Mathews* factor, the Court considers "whether the challenged procedure creates a risk of erroneous deprivation of individuals' private rights and the degree to which alternative procedures could ameliorate these risks." *Martinez v. Noem*, 2025 WL 2598379, at *3 (quoting *Gunaydin v. Trump*, No. 25-cv-1151, 2025 WL 1459154, at *8 (D. Minn. May 21, 2025)). Respondents argue that the statute's provision of release through discretionary humanitarian parole is sufficient due process. Resp. 16–17. However, the parole process under 8 U.S.C. § 1182(d)(5) consists of a custody review by ICE, not a neutral arbiter, and neither requires the agency to provide documentation of its reasoning nor allows for an appeal. Moreover, it appears that ICE "field offices no longer have the option to discretionarily release aliens." Romero Decl. ¶ 14; ICE Memorandum. To be sure, Respondents' counsel represented that obtaining humanitarian parole "might seem impossible, but it is possible." Sept. 23 Hr'g 13:43:20–13:43:32.

But even if it would not be entirely futile for Santiago to apply for humanitarian parole, the fact that this process is "more difficult now," *see id*. at 13:42:23–13:42:29, increases the risk of erroneous deprivation of her liberty. And several aspects of the humanitarian parole process make it insufficient as a matter of due process. Foremost, the decision is made by ICE, not a neutral arbiter. *See Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("And, of course, an impartial decision maker is essential."); *Giles v. Shaw Sch. Dist.*, 655 F. App'x 998, 1004 (5th Cir. 2016) (citation omitted) ("The basic requirement of constitutional [procedural] due process is a fair and

impartial tribunal, whether at the hands of a court, an administrative agency or a government

hearing officer."); *Rosario v. Searls*, No. 23-cv-6424, 2023 WL 7326047, at *3 (W.D.N.Y. Nov.

7, 2023) (finding custody determination by ICE to be insufficient due process because decision

was not made by a neutral decisionmaker); *Kabba v. Barr*, 403 F. Supp. 3d 180, 189 (W.D.N.Y.

2019) (same); *cf. Flores v. Rosen*, 984 F.3d 720, 734 (9th Cir. 2020) (holding bond hearing

before a Department of Health and Human Services adjudicator instead of an immigration judge

sufficient because due process only requires custody determinations to be "reviewed by an

adjudicator 'independent' from the entity making the determinations.").  Second, there is no

documentation—no statement of reasons.  *See Goldberg*, 397 U.S. at 271 ("[T]he decision maker

should state the reasons for his determination and indicate the evidence he relied on."); *Meza v.

Livingston*, No. 9-cv-50367, 2010 WL 6511727, at *14 (5th Cir. Oct. 19, 2010) (holding due

process required parole board to provide a written statement as to the evidence relied on and the

reasons for its decision to impose sex offender supervisions conditions).  And third, there is no

right to appeal.  *See, e.g.*, *Wilson v. N. E. Indep. Sch. Dist.*, No. 5:14-cv-140-RP, 2015 WL

13716013, at *7 (W.D. Tex. Sept. 30, 2015) (finding high risk of erroneous deprivation where

school district officials had broad discretion to ban members of the public from school board

meetings and there was no process to appeal such bans).  Taken together, these procedural

deficiencies in the humanitarian parole system create a high risk that Santiago will continue to be

erroneously deprived of her liberty.

　　　That is especially true where, as here, there has been no individualized explanation of any

kind for Santiago's detention.  Respondents' position appears to be that she was arrested

pursuant to a policy change that subjects her and those like her to mandatory detention.  But

absent some change in Santiago's personal circumstances, the decision to incarcerate her after

many years at liberty gives rise to an elevated concern that she has been detained without a valid reason. *See, e.g.*, *Valdez v. Joyce*, No. 25-cv-4627, 2025 WL 1707737, at *3–4 (S.D.N.Y. June 18, 2025).

In terms of available alternatives and their probable benefits, agency decisionmakers regularly "conduct[] individualized custody determinations . . . consider[ing] flight risk and dangerousness." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 242 (S.D.N.Y. 2020) (citation omitted); *see also* 8 C.F.R. §§ 236.1(c)(8), 1003.19(h)(3). Because such a proceeding would give Santiago the opportunity to be heard and receive a meaningful assessment of whether she is dangerous or likely to abscond, it would greatly reduce the risk of an erroneous deprivation of her liberty.

Another alternative would be to follow the procedures already available to Respondents as set out in 8 C.F.R. § 236.23(d) to terminate Santiago's DACA grant and subsequently seek her removal. Under these procedures, Santiago would be provided with notice of USCIS's intent to terminate her DACA and an opportunity to respond. 8 C.F.R. § 236.23(d)(1). And, upon termination, Respondents could seek removal and detention pursuant to those proceedings, as permitted by the law. Prior to termination, Santiago would remain at liberty, as she has been under the DACA program for the last thirteen years. This would wholly eliminate any risk of erroneous deprivation of her liberty. Therefore, the second *Mathews* factor also supports Santiago's claim that she has been denied procedural due process.

### c.    Government's Interest

On the final factor, at the Hearing, Respondents identified "[t]he legitimate reason the Government has stated for her current detention is to seek a removal order against her." Sept. 23 Hr'g 13:20:03–13:20:12. Of course, the Government has an interest in ensuring that noncitizens

appear for their removal hearings and do not pose a danger to the community. *See Zadvydas*, 533 U.S. at 690-91. The first interest, however, "is weak or nonexistent where removal seems a remote possibility at best." *Id.* at 690. Where an individual is protected from removal through deferred action, their detention serves no valid purpose. *See Sepulveda Ayala v. Bondi* ("Sepulveda Ayala II"), 25-cv-1063, 2025 WL 2209708, at *4 (W.D. Wash. Aug. 4, 2025) (concluding government had no legal basis to detain petitioner where deferred action prevented his removal); *Primero*, 2025 WL 1899115, at *5 (same).

Here, it is undisputed that Santiago is currently protected by DACA until April 2026. Respondents concede that even if they were to obtain a final removal order against her, they would not be able to execute it until her DACA expires without renewal or her DACA is terminated pursuant to proper procedures. Sept. 23 Hr'g 13:33:35–13:34:02. Santiago's removal is not just "remote," it is prohibited while she is protected by DACA. *See Zadvydas*, 533 U.S. at 690. In addition, there is no evidence in the record indicating that Santiago would abscond from her proceedings if Respondents are successful in their appeal. Santiago has passed DACA's stringent vetting requirements seven times and followed the rules to leave and reenter the country by seeking advance parole.

As to dangerousness, detaining an individual to protect the community is only permissible "when limited to specially dangerous individuals and subject to strong procedural protections." *Zadvydas*, 533 U.S. at 690–91. Respondents do not contend that Santiago presents a danger to the community and there is no evidence in the record that indicates otherwise. *See generally* Sept. 23 Hr'g; Resp. In order to obtain DACA, Santiago was required to disclose sensitive biographical and biometric information and submit to comprehensive background and security checks. *See* 87 Fed. Reg. 53152, 53158–61, 53178–80; 8 C.F.R. §§ 236.21–.23. She

has passed DACA's stringent requirements seven times, most recently in April 2024, and she was inspected and paroled into the country in 2022.[7]

Respondents did not present any evidence indicating that Santiago has endangered anyone during her twenty years at liberty, including her thirteen years under DACA.  Where "[r]elease [on bond or parole] reflects a determination by the government that the noncitizen is not a danger to the community or a fight risk," a grant of DACA must reflect the same.  *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd* 905 F.3d 1137 (9th Cir. 2018).  In sum, Respondents have no legitimate interest in detaining Santiago.  Tellingly, they have failed to even articulate an individualized reason for which she should be detained.  They rely exclusively on their generalized classification of her and others like her as arriving aliens.  *See, e.g.*, Resp. 16–17.  Again, the Court does not consider the validity of Respondents' interpretation of the INA.  The Court holds only that for Santiago, due process requires more.

Because all three *Mathews* factors support Santiago's position, the Court finds that detaining her without any individualized reasons deprives her of her constitutional right to procedural due process under the Fifth Amendment of the United States Constitution.  This decision is supported by a growing number of district courts across the country who have found that holding people like Santiago in mandatory detention likely constitutes a due process violation.  *See, e.g.*, *Espinoza*, 2025 WL 2581185, at \*11–12; *Kostak*, 2025 WL 2472136, at \*3; *Singh v. Andrews*, No. 25-cv-801, 2025 WL 1918679, at \*8–9 (collecting cases).

---

[7] Respondents do not contend that Santiago's arrest and conviction record makes her a danger.  *See generally* Resp.  Indeed, Santiago was approved for DACA multiple times after her 2015 disorderly conduct conviction and 2017 charges, and at least twice since her 2020 drug possession arrest.  *See* Pet. ¶ 32, Romero Decl. ¶ 3; DACA Approval Notices.

D.      **Scope of Relief**

As to the appropriate remedy, Petitioner requests that she be immediately released from custody.  Pet. 21.  For their part, Respondents appear to argue that the appropriate remedy, if any, is "substitute process."  Resp. 19.

Although courts have typically ordered a bond hearing to remedy procedural due process violations for immigration detainees, this remedy is appropriate where, unlike here, the government has at least some articulable, legitimate interest in detaining the petitioner.  *See, e.g.*, *Hernandez-Lara*, 10 F.4th at 46; *Velasco Lopez v. Decker*, 978 F.3d 842, 855 & n.14 (2d Cir. 2020); *Kostak*, 2025 WL 2472136, at *4; *Maldonado*, 150 F. Supp. 3d at 811–12 (collecting cases).  And in recent weeks, many district courts have determined instead to order the immediate release of immigration habeas petitioners held in custody in violation of their due process rights.  *See, e.g.*, *J.U. v. Maldonado*, No. 25-cv-4836, 2025 WL 2772765, at *10 (E.D.N.Y. Sept. 29, 2025); *Zumba v. Bondi*, No. 25-cv-14626, 2025 WL 2753496, at *11 (D.N.J. Sept. 26, 2025); *Sampiao v. Hyde*, No. 25-cv-11981, 2025 WL 2607924, at *12 (D. Mass. Sept. 9, 2025); *Rosado*, 2025 WL 2337099, at *19; *M.S.L.*, 2025 WL 2430267, at *15.  In the majority of these cases, the Court found that the government had no or an insignificant interest in detaining the petitioner.  *See J.U.*, 2025 WL 2772765, at *10; *Zumba*, 2025 WL 2753496, at *10; *Rosado*, 2025 WL 2337099, at *14, 18; *Sepulveda Ayala II*, 2025 WL 2209708, at *3.  In the context of deferred action recipients, district courts have found both immediate release and a bond hearing to be appropriate remedies.  *Compare Sepulveda Ayala II*, 2025 WL 2209708, at *5 (ordering immediate release) *with Primero*, 2025 WL 1899115, at *5 (ordering bond hearing).

The Court is persuaded that the appropriate remedy here is immediate release. Respondents' only stated interest in Santiago's detention is to "seek a removal order against

her," Sept. 23 Hr'g 13:20:03–13:20:12, and they concede that such removal order is inexecutable

because Santiago is protected by DACA, *id.* at 13:33:35–13:34:02. As a result, there is "no legal

basis to detain [her]," and her immediate release is warranted. *Sepulveda Ayala II*, 2025 WL

2209708, at * 4–5. Release is also appropriate because there has not been any change in

Santiago's circumstances since she was last renewed for DACA, such as might indicate that she

has become a flight risk or a danger to the community. *See J.U.*, 2025 WL 2772765, at *10

("Given the deprivation of Petitioner's liberty, formerly granted and approved by Respondent,

the absence of any deliberative process prior to or contemporaneous with the deprivation, and the

statutory and constitutional rights implicated, a writ of habeas corpus is the only form of relief

and the most appropriate remedy.").

     Without a legitimate interest in her detention, immediate release appropriately remedies

Respondents' violation of Santiago's due process rights through her continued detention. *See*

*Sepulveda Ayala II*, 2025 WL 2209708, at * 4–5.

## III.    CONCLUSION

     For the foregoing reasons, the Petition for Writ of Habeas Corpus, ECF No. 1, is

**GRANTED IN PART**, on procedural due process grounds. The Court **ORDERS** that

Respondents must **IMMEDIATELY RELEASE** Santiago from custody. Santiago must be

released from custody at the earliest reasonable opportunity and in no event may she be detained

beyond **<u>4:00 p.m. on October 2, 2025</u>**.

     **IT IS FURTHER ORDERED** that **by <u>no later than 12:00 p.m. on October 3, 2025</u>**,

Respondents shall **FILE** written notice informing the Court whether Santiago has been released

from custody and stating the date and time of her release.

     **<u>There will be no extensions of these deadlines</u>**.

**SO ORDERED**.

**SIGNED this 1st day of October, 2025.**

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE